CHARLES G. HAMMOND, AUDITOR GENERAL, JOHN J. AD-
AM, STATE TREASURER, AND ROBERT P. ELDREDGE,
SECRETARY OF STATE, v. THE PRESIDENT, DIRECTORS,
AND COMPANY OF THE MICHIGAN STATE BANK, GEORGE
F. PORTER AND JAMES F. JOY.

The commissioners appointed to settle with the Michigan State Bank, under the act
of February 1, 1840, had no right to bind the state to pay any debts of the bank.

Where an agent, acting within the scope of his authority, does a thing which, stand-
ing alone and by itself, would be binding on his principal, and at the same time does
something more, which he was not authorized to do, and the two are not so inter-
woven with each other that they cannot be separated, but constitute different parts
of the same contract, that which the agent was authorized to do, is binding on his
principal, and that only which he was not authorized to do, is void.

A person who deals with an agent is bound to inquire into his authority, and igno-
rance of the extent of the agent's authority, is no excuse.

To determine whether a bill is multifarious, we must look to the stating part of the
bill, and not to the prayer alone; for, if, in his prayer for relief, complainant ask
several things, to some of which he may be entitled, and to others not, the bill is
not on that account multifarious, but he will, on the hearing, be entitled to that spe-
cific relief only, which is consistent with the case made in the stating part of the
bill.

Where the Michigan State Bank made an assignment to the commissioners appointed
on behalf of the state to make a settlement with it, on condition that the state
should indemnify and save harmless the bank from certain liabilities, and the com-
missioners thereupon released the bank from all its liability to the state, and the
state refused to accept the condition, (which the commissioners were not authori-
zed to make,) and caused a bill to be filed to recover possession of a part of the
property assigned, and for an account, and was demurred to, for want of equity, the
demurrer was overruled; and it was *held* that the state acquired by the assignment,
a right to the property, notwithstanding the rejection of the condition.

DEMURRER to bill filed by complainants, as trustees for
the state, under " an act to provide for the collection of
certain assets transferred to the state, and for other pur-
poses." *Session Laws of* 1842, *page* 110.

The bill states that the state of Michigan, previous to

the 26th of February, 1839, had deposited large sums of money for safe keeping, in the Michigan State Bank, and that on that day the bank stopped payment, having in deposite money belonging to the state, to the amount of six hundred thousand dollars, and upwards. That soon thereafter the bank proposed to settle with the state, and to turn out property in payment of the debt, and thereupon the legislature, by an act approved April 10th, 1839, (Session Laws of '39, page 73,) authorized the Secretary of State, Auditor General, and Andrew G. Hammond, as a committee on the part of the legislature, to settle with the bank for all deposites made with the bank by the State. That this committee did not effect a settlement, in consequence of the bank claiming to set off certain demands which the committee did not think themselves authorized to allow under the act. That, thereupon, the legislature passed a joint resolution, which was approved April 19, 1839, entitled "A joint resolution of the Senate and House of Representatives to extend the time for settlement with the Michigan State Bank, and to increase the powers of the commissioners charged with that duty." By this resolution the Auditor General, Secretary of State and Jonathan Kearsley, were appointed commissioners to settle with the bank, "upon such terms as they may deem equitable," with authority "to extend the time for the payment of the balances found to be due from said bank to the state," &c. (Session Laws of '39, p. 262.) That the commissioners failed to make a settlement, and reported that fact, with their proceedings, to the Governor of the state, June 8th, 1839, and, on the fifteenth day of the same month, the Attorney General filed a bill in chancery against the bank, on the part of the state, and obtained an injunction. That the legislature afterwards passed

another act, approved February 1, 1840, which act is in these words:

"An act authorizing the Auditor General, the State Treasurer, and the Secretary of State, (for the time being,) to settle with the Michigan State Bank."

"*Section* 1. Be it enacted by the Senate and House of Representatives of the State of Michigan, That Eurotas P. Hastings, Auditor General, Robert Stuart, Treasurer of the State, and the Secretary of State, (for the time being,) be, and they are hereby appointed commissioners on the part of the state to settle with the Michigan State Bank, upon such terms as they may deem equitable. The said commissioners are hereby authorized to give such time for the payment of the balances found to be due from the said bank to the state, as the ability of said bank to meet the said several balances may seem to require; and the said commissioners are hereby authorized to receive from said bank its bond or bonds, or other satisfactory security, conditioned for the payment of said balances, at such times as may be agreed upon between said commissioners, and the president and directors of said bank.

"2. The Treasurer of the State is hereby directed, on the payment of the balances so found due from said bank, to pass the same to the credit of the several funds to which they now stand due, in the proportions the said payments may bear to said several funds.

"3. In case the said bank shall fail to meet the payment of its bonds, as conditioned, the Auditor General shall be, and he is hereby directed to report such failure to the Attorney General, who shall thereupon proceed to collect from said bank and its sureties, the amount which may be due, in the name of the state of Michigan.

"4. The persons hereby employed, shall have power to commute and receive an assignment of any of the as-

sets of the bank, which, in their opinion, shall be for the interest of the state."

On the first of May thereafter, a settlement was made between the state, by its commissioners, and the bank, in the following words:

" This indenture, made this first day of May, in the year of our Lord one thousand eight hundred and forty, between the president, directors, and company of the Michigan State Bank, of the first part, and Eurotas P. Hastings, Auditor General, Robert Stuart, Treasurer, and Thomas Rowland, Secretary of the State of Michigan, commissioners for and on behalf of the state of Michigan, for the purpose of settling with the party of the first part, parties of the second part, witnesseth :

" That the party of the first part, for the purpose aforesaid, doth hereby assign, transfer, and set over to the parties of the second part, all the beneficial interest of the party of the first part, in and to all the property, effects, notes, accounts, real estate, mortgage securities, and choses in action, contained in schedule marked A, hereunto annexed, with all the rights, privileges and appurtenances thereunto belonging, and with all the collateral securities by the party of the first part, held, for and on account of them or any of them, in full payment and satisfaction of all debts and liabilities of the party of the first part, to the state of Michigan ; subject, nevertheless, to all and any discrepancies in the accounts and demands, arising from errors or contingent claims, and also subject to all just charges of counsel and expenses heretofore accrued and hereafter to accrue, upon such as are in process of collection at law, or in chancery ; and the party of the first part doth hereby authorize, constitute and appoint the parties of the second part, and each of them, their successors and assigns, or such other person as may be ap-

pointed by the legislature, the attorneys of the party of
the first part, to sell, convey, alien, lease, assign, collect,
secure, commute and compromise, all and singular, the
property and demands in said schedule described, in their
own names, or in that of the party of the first part, but at
their own proper costs and charges, and all deeds, leases
and acquittances to give, necessary in the premises, here-
by ratifying and confirming all their lawful acts and doings
in the matters aforesaid. And the party of the first part
hereby covenant and agree, to and with the parties of the
second part, that it will grant to the said parties of the
second part, their agent or attorney, at all reasonable
times, access to such books and papers connected with the
property and demands mentioned in said schedule A, as
are or may be in its possession, and as shall and may be
necessary, and to furnish all such information, from time
to time, to the parties of the second part, as they may de-
sire, and the party of the first part, or its officers, may be
possessed of or knowing to, in the premises.

"And the parties of the second part, by virtue of the
authority vested in them, by "an act entitled 'an act au-
thorizing the Auditor General, the State Treasurer, and
the Secretary of State, for the time being, to settle with
the Michigan State Bank,' approved February 1st, A. D.
1840," and by an act entitled "an act in relation to the
Michigan State Bank," approved March 28th, 1840, do
hereby, in consideration of the conveyance, covenants and
stipulations of the party of the first part, hereinbefore set
forth, fully acquit and discharge the said party of the first
part from all claims, debts, dues and demands against the
said party of the first part, and in favor of the state of
Michigan, and from all liability thereon, or on account of
the premises, to the state of Michigan aforesaid.

"And it is hereby understood by and between the par-

ties of the first and second part, that the assignments of the property and effects contained in schedule A, is made upon and subject to the express condition that the state of Michigan shall indemnify and save harmless the party of the first part, and their grantors, immediate and remote, from and against the several claims and liabilities hereinafter specified, forever, viz: A certain bond and mortgage, executed by the party of the first part, to the Bank of Michigan, upon their banking house and lot, this day conveyed by the party of the first part to the Auditor General, subject to said mortgage, upon which there remains unpaid the principal sum of $11,250; also, a certain bond and mortgage, executed by Lansing B. Mizner to James H. Wood, dated October 19th, A. D. 1838, on a house and lot this day conveyed by the party of the first part to the Auditor General, subject to said mortgage, upon which the principal sum of $1,500 remains unpaid; also, a certain bond and mortgage, executed by Eurotas P. Hastings to William W. Miller, upon lots eight, nine, fifty-four and fifty-five, in section four, in the city of Detroit, this day conveyed by the party of the first part to the Auditor General, upon which the principal sum of $10,000 remains unpaid; also, all and sundry claims by and in favor of attorneys and agents, for professional services and disbursements, in and about the collection and securing of all or any of the demands set forth in said schedule A, which have accrued or may hereafter accrue, upon any collateral securities which are transferred to the state of Michigan, and more particularly set forth in schedule marked B, hereunto annexed. In testimony whereof," &c.

The bill further states, that the property assigned was delivered over to the Auditor General, for the state, and the injunction against the bank was dissolved with the assent of the Attorney General, given in consequence of the

settlement. That many of the demands, when the assignment was made, were in possession of the defendants, Joy & Porter, attorneys for the bank, for prosecution and collection, and that they were employed by the Auditor General to continue the prosecution and collection of such demands for the state. That, by an act of the legislature, approved February 17, 1842, the complainants were constituted trustees on behalf of the state, to take charge of the property so assigned, &c., and the settlement with the bank was ratified, except, in the language of the act, "so much thereof as purports to bind the state to make any indemnities to the said Michigan State Bank, and so much as purports to bind the state to the payment or advancement of money, whether for the purpose of discharging incumbrances, paying costs, or for any other purpose whatever, which portions are hereby, on the part of the state, expressly rejected." That, on or about the 7th of March, 1842, the complainants, Adam and Eldredge, applied to Joy & Porter for a statement of the situation of the assets in their hands, which they refused to give. That complainants believed they had not properly conducted the business entrusted to them, as attorneys for the state; that, while so employed, they were also employed by the bank, adversely to the interest of the state; that, on or about the 12th of March, 1842, and while they were professing to act as attorneys for the state, the president, directors and company of the bank, filed a bill in this Court against the said Eurotas P. Hastings, late Auditor General, to enjoin him from parting with the said assets and assigned property, to any officer or trustee appointed by the state to take charge thereof, and praying that he might be deemed, adjudged and declared a trustee for the bank, and that said Joy was counsel for the bank, and signed said bill as such, and that said bill was verified by the oath of said Porter, as president of the bank.

That, on the 4th of May, 1842, complainants address-ed to Joy & Porter the following letter:

"Detroit, May 4, 1842.
"Messrs. Joy & Porter:

"Gentlemen—On the 14th day of March last, the Au-ditor General, Secretary of State, and State Treasurer, addressed you a note, requesting you to furnish them (as trustees, &c.) a statement of the assets in your hands, as attorneys, belonging to the state of Michigan, which were assigned to the state by the Michigan State Bank, together with an account, (among other things,) of your profes-sional charges on the same. Your reply thereto is entirely unsatisfactory. We cannot recognise Eurotas P. Hast-ings, Esq., late Auditor General, as your client in relation to said assets at this time. By the assignment of the Michigan State Bank, the said assets became the property of the state, and the successor of Mr. Hastings succeed-ed to all the rights to possess and control the same, which Mr. Hastings, as a state officer, ever had.

"The act of the legislature, approved February 17th, 1842, constituted the Auditor General, State Treasurer, and Secretary of State, trustees to take charge of said as-sets.

"As such trustees, we do hereby demand that you de-liver up to us, immediately on the receipt of this, all said assets now in your hands, all moneys you have collected on the same, and all mortgages, deeds, or other evidences of debt connected with, or growing out of said assets. We hereby furnish you with a schedule of the demands, notes, and accounts left with you, which were assigned to the state, and for which the state holds you personally respon-sible. You are also notified that your power, as attorneys over said assets, is hereby revoked; and that, hereafter,

any action of yours in relation to said assets, will not be sanctioned by the state. The revocation of your powers as attorneys in the premises, render it necessary that you forthwith account to us as such trustees, for said assets, and all moneys you may have collected or received on the same, as well as any and all securities you may have taken in the collection of any portion of said assets. A continued refusal on your part, to account to us as said trustees for said assets, and for the moneys you may have collected on the same, will be considered by us a breach of your professional duties, and impose upon us the unpleasant duty of applying to the laws and the courts for the proper redress.

"Hoping that you may, on reflection, be induced to act in the premises pursuant to law, and in accordance with the rules which subsist between attorneys and clients,

    "We are, respectfully,

        "Your obedient servants,

            "C. G. HAMMOND,
                "*Auditor General,*
            "J. J. ADAM,
                "*State Treasurer,*    } *Trustees.*"
            "R. P. ELDREDGE,
                "*Secretary of State,*

That, on the seventh of the same month, complainants received from Joy & Porter an answer, dated on the fourth of May, from which the following is an extract:

                        "Detroit, May 4, 1842.

"Gentlemen—We have your letter of to-day, enclosing a schedule of papers which you supposed to be in our office for collection, for the benefit of the state, as the assignee of the Michigan State Bank. With regard to that schedule, we may remark that most of the papers therein mentioned, were never in our office, or in any way subject

to our control or supervision. With regard to those which were actually placed in our hands by the State Bank, (and none of these papers were placed in our hands by any one else,) we have to say that, in the present position of the controversy between that bank and the state, we cannot, with safety to ourselves as individuals, nor with propriety as professional men, place them in your control.

"The bank does not recognise your right to take possession of these assets. It does not recognise the right or the power of the legislature to say that its property shall be taken from it and appropriated to public use, without a compensation. Nor does it choose to submit to arbitrary, unjust, and oppressive acts of legislation, which break down all the barriers of private right, and subjects, (if the legislature possesses the power which it has attempted to exercise in this instance,) all the private property of all the citizens of the state, to the mere will of the legislature, without control or possibility of procuring any redress. It will not voluntarily submit to be deprived of its property, by the state, in violation of its rights, and in open violation of express stipulations and conditions, and of the universal right guaranteed by the great fundamental principles of our government, to all who enjoy its protection, to acquire and be protected in the possession and enjoyment of their private property. The assignment to which you allude, conveyed these and other assets to the commissioners appointed by the state, *upon and subject to an express condition* to be performed by the state. Upon the performance of that condition, the state would, of course, acquire an absolute right to the property. And it is equally clear, that, if the state refused to perform the condition, it must forfeit all right and title in and to the property so assigned.

"In our view, it requires no very great astuteness of

mind, or clearness of perception, to see this consequence. Now, the state has refused to fulfil and perform the condition, upon the performance of which alone, it might acquire the right to take possession of, and control the property, and yet, by an act of legislation, endeavors to seize it, in fraud of the rights of the bank, in violation of law, and of the most cherished principles of our institutions, and of civil right and liberty. Under these circumstances, you will excuse us if we cannot see, (as you do so clearly,) that these assets have become the property of the state, and that you have succeeded, as state officers, to the right to the possession and control of them.

"We shall very cheerfully render, for the present, an account to the individual, (Mr. Hastings,) who is entitled to it, and we shall as cheerfully render you an account of our doings in the premises when it shall be ultimately decided that you have a right to it. At present the whole matter is involved in the suit now pending, relative to.this settlement, and by no means yet determined. And, for your information, we may remark that a transaction of this nature, on the part of the state, in open and utter disregard of private rights, and of the protection which is due from the government to these rights, resulting, in fact, in a confiscation of property, without a trial by court or jury, cannot take place, pass by, be acquiesced in by us as counsel for the state bank, as one, where no remedy can be had but silence; no relief, but such as those enjoy, who tamely submit to arbitrary power," &c.

The bill further states, that the bank claims the property and effects assigned to the state to be the property of the bank, and that Joy & Porter claim to hold the assets placed in their hands by the state as attorneys for the bank, and prays that the bank may be decreed specifically to perform the agreement, and that the bank, and Joy &

Porter may render an account of all and singular, the property, assets, demands, and effects in their possession, or under their control, and that an account may be taken of all moneys received by them on account of said claims and demands, &c., and that, if the Court should be of opinion the settlement between the bank and state is not binding, then, that the bank may be decreed to account to complainants for what is due from it to the state, and for other or further relief.

The demurrer to the bill is general, specifying no special cause.

*Joy & Porter*, in support of the demurrer.

Upon the state of facts mentioned in the bill, what is this case?

*First.* It is an assignment upon a condition express, and the property, by the terms of the assignment, was conveyed to Hastings and others, subject to, and upon, the express condition that the state of Michigan should do certain acts, which it now refuses positively to do. And yet, with a positive and absolute refusal to perform the condition, this bill is filed against the State Bank, and its counsel, to procure possession of the property, which complainants are entitled to only upon the performance of the condition. Have they a right to the possession of the property? In cases of this nature, the right of property, or possession of the property, is dependent upon the performance of the conditions. 2 *Kent Com.* 497; 2 *Pick. R.* 515 ; 2 *Barn. & Ald.* 330; 2 *Hill R.* 327; 6 *J. C. R.* 438; 19 *Ves. R.* 235; 4 *Mass. R.* 294, &c.

Here, then, it is clear that these complainants, or the state, on general principles, have no right to touch a dollar of this property, having refused to fulfil the conditions.

And the bank may replevy from them all the personal property they held, and eject them from all the real estate.

For the nature of the condition, see *Cruise Dig. Tit.* 13, *Ch.* 1. *Sec.* 9, 10, 17, 18; *Ch.* 2, *Sec.* 39, 49, 55–57. *Sheph. Touchst.* 119–126, &c. And a condition binds the King, as well as others; there is no exception. If the condition be not fulfilled, this Court will, in a proper case, decree a reconveyance. *Cruise Dig. Tit.* 13, *Ch.* 2, *Sec.* 39. And nothing will excuse the performance of the condition, except impossibility, the act of God, &c. *Sheph. Touchst.* 132, 157 ; 10 *J. R.* 27.

Here, then, upon every principle of right, of law, of equity and common sense ;—upon every principle except that of arbitrary power;—we have a right to a decree in this Court, that the property be reconveyed to us. Then how can they ask that this Court shall assist in carrying out their nefarious designs?

But a law has been passed, directing these complainants to take this property, convert it, and pay with the proceeds state scrip, &c. Under this act the complainants claim. *Laws* 1840, *p.* 9, 128; *Laws* 1842, *p.* 110. Now, what is the character of this act? Is it valid, or void? Had the state a right to pass it?

It is void for several reasons. It is an act of gross tyranny. It rejects the condition, and thereby rejects the property, and yet seizes it. It is a seizure of private property for the redemption of state scrip, without judge, jury, or law—without any estimation of value,—without any compensation,—without any state necessity, without any justification whatever. This will appear, if we reflect upon the rights of the parties. The state has no right to pass such a law. 1 *Pet. Cond. R.* 173–5. 2 *Pet. R.* 656. 3 *Story Com. on Const.* 661, &c.

But again, this act is in violation of the second article

of the ordinance of 1787, which says that no person shall be deprived of life, liberty, or property, without due process of law; and is, for that reason, void.

What is due process of law? It means law in its regular course of administration, through courts of justice. 3 *Story Com. on Const.* 264, 661; 2 *Dal. R.* 312; 9 *Gill· & J.* 412; 1 *Bl. Com.* 139 *et seq.* This property, therefore, seized under this act, is not seized by process, or due process of law, at all.

It is void for another reason, and that is, that it is in contravention of article 3, of the constitution of the state of Michigan, which separates legislative, judicial, and executive powers. Now, here is a question of law, as to the rights of the parties, under this assignment, subject to this condition, which ought to have been left to the judicial tribunals of the country, where parties could be heard, and their rights adjudicated upon. Instead of this, the legislative power adjudicates, condemns and executes, without a chance of hearing on the other side.

Besides, this law violates the contract made by the State Bank with the commissioners, and is therefore void, under the clause of the constitution which forbids any state to pass any law impairing the obligation of contracts. The act, in fact, alters the contract, and makes that which was conditional, absolute. Suppose an act should be passed, making all estates conveyed to the state or its commissioners, heretofore, or to any other individual, (for the principle is the same,) upon condition, absolute and not subject to condition; who will pretend that such a law would be constitutional? And, if a general law would not be, how can a law which affects but a single case be constitutional?

Let it not be said that the state had a large debt against the bank, and takes this means to collect it. The state

has the same process of law for the collection of debts, as citizens. Courts are open to it ; it may sue, and by *due process of law* it may collect what is due to it. But can the legislature adjudicate upon the amount which is due, try the case *ex-parte*, condemn, issue process, and seize the property, &c.?

This act of the legislature, therefore, can give no rights. It is a void act, and will not justify those who act under it. They may be sued in trover, trespass, ejectment, and for mesne profits. 5 *Pet. Cond. R.* 743; 18 *Pick. R.* 502; 12 *Mass. R.* 468; 7 *Mass. R.* 394; 11 *Mass. R.* 401.

But, upon the general principles upon which this Court acts, these parties are entitled to no relief; their bill must be dismissed. They come here, alleging their own violent and arbitrary action, and pray for relief which they are entitled to, upon their own showing, only in consequence of their own wrong, and violent and oppressive action. They must do equity before they can have equity,—they must fulfil this condition, and then they will have no need to come in here, and ask this Court to become the hand-maid of their iniquity.

*Multifariousness.*

But this bill, even supposing the strange legal positions taken by the complainants, to be true, ought to be dismissed. It is multifarious. It unites two distinct defendants, on distinct grounds, for distinct causes of action. Either the state has a right to all the papers in the hands of Joy & Porter, or it has not. It is a question of legal right solely, and to procure an account from Joy & Porter, of matters in their hands belonging to the state, the bill should have been filed against them unmixed with any thing else. Suppose this Court should determine that this bill cannot be maintained against them, what earthly con-nection have they with the alternative prayer against the

bank? If this bill can be maintained against Joy & Porter, it must be upon the ground that there is a complete and final settlement with the bank, by which the property passed to the state. If it did so pass, then Joy & Porter, holding state property, are alone liable, and there must be a decree against them alone. There can be no decree against the bank upon this basis. But a decree is asked against the bank, if this Court is of opinion that the settlement made by the state commissioners with the bank, is not binding and final upon the state, i. e. if this settlement is good and binding, then give us a decree against Joy & Porter for an account; if it be not binding, then give us a decree against the State Bank. This is very clear, for the averments in the bill show that, in one aspect of the case, they can have a decree against Joy & Porter alone. In folios fifty, fifty-one, and fifty-two, it is averred that the bank has completely fulfilled all its stipulations, and delivered all the assets, property, &c. to the commissioners. The bank has specifically performed, and yet they ask a specific performance of the agreement. They have no right to ask a decree against the bank, according to their own showing, in this aspect of the case. They certainly have no right to ask one in the other aspect of the case, because the bank is released under the settlement. The commissioners executed a release, and that part of the contract is sanctioned by the legislature. *Laws of* 1842, *p.* 110.

*Van Dyke & Harrington,* contra.

I. The first question that arises in this case is, have the complainants any such interest in, or control over the property which forms the subject matter of this suit, as will authorize them to take or hold the possession of the same?

The complainants claim the right to the property under

the provisions of the act entitled "an act to provide for the collection of certain assets transferred to the state, and for other purposes," approved February 17th, 1842, by which act they are "constituted trustees in behalf of the state, to take charge of the assets assigned to the state, by the Michigan State Bank."

It appears by the bill in this case, that commissioners were appointed by an act of the legislature, in 1840, for, and on behalf of the state of Michigan, to settle with the Michigan State Bank, and that the property which forms the subject matter of this suit, was *conveyed and delivered* to the commissioners acting on behalf of the state, by the bank, under the agreement of May 1st, 1840, between the president, directors, and company of the Michigan State Bank, and Eurotas P. Hastings, Auditor General, Robert Stuart, Treasurer, and Thomas Rowland, Secretary of the state of Michigan, acting for and on behalf of the state.

If, therefore, the property passed to the state, by virtue of the settlement, conveyance, assignment, and delivery, there can be no doubt that the complainants, who have been appointed by an act of the legislature, trustees to take charge of that very property, for and on behalf of the state, have a right to its possession, management, and control.

It is contended on the part of the defendants, that the state has never complied with the condition of the agreement, but, on the contrary, that it has, by the second section of the act of February 17th, expressly rejected the condition, and thereby repudiated the acts of the commissioners and rescinded the agreement. Suppose this to be the case, the state has an unquestionable right to hold on to the property of an insolvent debtor which is in its possession, and to appoint trustees or receivers to take charge

of it, and appropriate and apply sufficient to pay the debt. This is a legitimate act of sovereignty, not abridged or controlled by the constitution. It is not taking private property for public use without just compensation, but is merely the assertion of a right, on the part of the state, of priority of payment out of the assets of an insolvent debtor, which are in the possession of the state. Congress have always claimed the right to pass laws to give the United States priority of payment out of the property of insolvent debtors, and those laws have, in all cases, been declared constitutional. 1 *Kent Com. (2d ed.)* 243 *to* 246. As to the power of the state to pass the act of February 17th, see *Serg. Const. Law*, 357, *et seq.*

II. The state has a right to the property under the settlement and agreement entered into by and between the commissioners on behalf of the state and the Michigan State Bank, without performing the condition attached to that agreement.

The commissioners exceeded their authority in attaching the condition, and it never was obligatory upon the state.

The extent of the obligation of that agreement depends,

1st. Upon the authority, and,

2d. Upon the power of the commissioners.

1st. As to the authority of the commissioners. The authority of the commissioners was derived wholly and entirely from the act of February 1, 1840. It was a *special* and *limited* authority to do a *specified* and *particular* act, viz : " To settle with the Michigan State Bank on such terms as they might deem equitable." They were authorized to *receive an assignment* of the assets of the bank, but the act gave them no power or authority to bind the state to *indemnify* or pay *money*. A special authority must be strictly pursued in order to bind the principal.

Even in case of agencies, if the authority of the agent purports to be derived from a written instrument, the party dealing with the agent ought to call for and examine the instrument itself, to see whether it justifies the act of the agent; and if, from his omission to examine, he should encounter a loss from the defective authority of the agent, it is properly attributable to his own fault. *Story on Agency*, 69; *Atwood* v. *Munnings*, 7 *B. & Cres.* 278; *Willington* v. *Herring*, 5 *Bing. R.* 442; 1 *Pet. R.* 264, 290; 1 *Chitty on Cont.* 174, 177; *Snow* v. *Perry*, 9 *Pick. R.* 542; *Lee* v. *Monroe*, 2 *Pet. Cond. R.* 531, and note at the end of the case; 13 *Pet. Abr.* 508. And the case is much stronger where commissioners are appointed by, and derive their authority from, a special act of the legislature. *Denning* v. *Smith*, 3 *J. C. R.* 344.

Here the agreement was entered into by the commissioners, as appears upon the face of it, "by virtue of the authority vested in them by an act entitled an act authorizing the Auditor General," &c. "to settle with the Michigan State Bank," &c. The authority under which the commissioners acted, therefore, is not only *presumed* to be within the knowledge of the party with whom they contracted, but it is referred to in the agreement itself, and the contract is made by both parties in reference to the authority contained in the act appointing the commissioners.

2. As to the *power* of the commissioners to bind the state to *indemnify* and pay *money*.

A power may be given by deed, by will, or by act of Parliament. *Sugd. on Powers*, 1; *Paley on Agency*, by *Lloyd*, 191. In construing the extent of a power, the intention of the parties must be the guide. *Ibid*, 459; 2 *Cow. R.* 233.

What was the intention of the legislature, when they

Hammond *v.* Michigan State Bank.

passed the act authorizing the settlement? Was it their intention, when they appointed commissioners and gave them authority and power to settle with an insolvent debtor, upon such terms as they might deem *equitable*, that those commissioners should be at liberty to bind the state *to indemnify* and pay *money* to an unlimited extent? This is contrary to common sense, and to all rules of construction.

It is contended on the part of the defendants, that the act authorizing the settlement gave the commissioners full *discretionary* power to what they might deem *equitable* in the premises, and the commissioners having deemed it *equitable* that the State should make the *indemnities* and *payments* specified in the condition annexed to the agreement, it is legally bound so to do.

Where a *discretionary* power is given, it means that a *legal* discretion is to be exercised, not a wild arbitrary and capricious discretion, which has neither law nor reason to control it. It must be a sound discretion, exercised upon a view of all the circumstances, to render it a legal discretion. 6 *J. C. R.* 222; 1 *Harr. Ch. R.* 126; *Story on Agency,* 67.

But, how came this word *equitable* to be used in the act?

April 10, 1839, an act was passed (see act No. 44,) appointing commissioners, and authorizing them to settle with the Michigan State Bank. April 12, 1839, the commissioners report, (see House Doc. 925, No. 51,) that the bank claims an *equitable* offset against the demand of the state, for money advanced to state officers to the amount of $50,000. The allowance of which the commissioners thought was not legitimately within the scope of their power and duties, under the act by which they were appointed. The committee " suggest in their report, (page 930,) for the consideration of the legislature, that the

question of settlement depends upon the justice or *equity* of the claims of the bank against the state, and becomes in a measure a matter of expediency, &c., and they ask the legislature to settle the matter, whether these claims shall be allowed or not."

Upon this report being made to the legislature, they passed a joint resolution April 19th, 1839, (see resolution No. 29,) appointing "commissioners to settle with the Michigan State Bank, upon such terms as they may deem *equitable.*"

No settlement was effected by the commissioners appointed by this resolution, and, February 1st, 1840, act No. 8 was passed, adopting the language of this resolution. This is the way this word *equitable* comes to be used in the act. It was intended merely to give the commissioners power to allow the bank, on the settlement, these *equitable* offsets against the state, and nothing more; and this all appears from the public, and published acts, resolutions, and documents of the legislature, and, being public acts and documents, all parties were bound to take notice of them.

III. If the commissioners exceeded their power and authority in attempting to bind the state to *indemnify* and pay *money*, then is the agreement void *in toto*, or is only so much void as exceeds the power and authority given them by the act.

In construing the contract or agreement, and ascertaining how far it is obligatory upon the state, it is proper to attend as well to the character of the commissioners, as the terms of the contract. The commissioners in this case were appointed by a public act, to discharge a public trust, for a public benefit. *See* 17 *Eng. Com. Law R.* 328. And, so far as they acted legitimately, and within the scope of their authority under the powers conferred,

effect ought to be given to the agreement, and no further. The power and authority under which they acted, was special and limited. "An agent, constituted for a particular purpose, and under a limited power, cannot bind his principal if he exceeds his power. The special authority must be strictly pursued. Whoever deals with an agent constituted for a special purpose, deals at his peril when the agent passes the precise limit of his power. 2 *Kent Com.* 620; *Story on Agency*, 69, 77. And it is a well settled principle in the construction of powers, that where there is a complete execution of a power, and something more is added which is improper, the execution is good, and the excess only is void. *Co. Litt.* 258, *a;* 4 *Cruise Dig.* 216, *Sec.* 45; *Id.* 218, *Sec.* 49–50; *Warner* v. *Howell,* 3 *Wash. C. C. R.* 12. *See also Griffith* v. *Harrison,* 4 *T. R.* 744.

This rule applies as well to agents acting under special authority, as to persons executing a power. *Story on Agency*, 156, 160; 2 *Kent Com.* 617–618; *State of Illinois* v. *Delafield,* 8 *Paige R.* 527; *S. C. on Appeal,* 2 *Hill R.* 155.

In *Nixon* v. *Hyseratt,* 5 *J. R.* 58, where an agent was authorized to sell and convey to the purchaser, in fee, as should be needful or necessary, according to the *judgment of the agent,* and the agent executed a conveyance with covenant of *seisin,* it was held the principal was not bound by the covenant of *seisin,* but the *legality* of the *conveyance* was not questioned. 7 *J. R.* 390; *Chitty on Contr.* 171, *(n.* 1;*)* 6 *Cow. R.* 354.

In this case the bounds between the proper execution of the trust and the excess, are clear and distinct.

The agreement is perfect and complete without the condition annexed, and the condition not being warranted by the authority given to the commissioners, is not obligatory upon the state, but is void absolutely without any

action on the part of the state, but the state has also expressly rejected the condition by a public act. *See act of February* 17, 1842, *Sec.* 2.

If then the state is not bound to execute and carry into effect the entire agreement as executed by the commissioners, and has expressly refused so to do, is that agreement to be considered as abandoned *in toto* and rescinded, or can it be enforced by the state to the extent of the authority and powers of the commissioners?

It is contended by the defendants that the rejected part annexed to the agreement is a *condition precedent*, and having been rejected, the whole agreement is rescinded. The answer to this is,

*First.* That condition was *void*, absolutely from the beginning, and therefore never formed any part of the agreement.

*Second.* It is not a condition precedent. A condition precedent is an act to be performed by the plaintiff before the defendant's liability is to accrue under his contract. *Chitty on Contr.* 570. That part of the agreement which is called the condition, after providing that the state shall pay certain mortgages, &c., proceeds, " Also all and sundry claims by and in favor of attorneys and agents for professional services and disbursements, in and about the collection and security of all or any of the demands set forth in said schedule A, which have accrued or *may hereafter accrue, upon any collateral* securities which are transferred to the state of Michigan," &c. How are these payments to be made before these services are to be performed, or before it is possible to know what amount of services are to be performed, or what they would amount to?

But suppose it to have been originally a condition precedent, and binding and obligatory on the state, the parties

now claiming the benefit of that condition have waived it by their own act.

It appears by the bill filed in this case, (and which, upon the demurrer must be taken to be true,) that, on the execution of the agreement, the property and effects assigned and conveyed were delivered over to the state, and have since been held by the state or its officers appointed to take charge of the same.

A party, to avail himself of a condition precedent, who waives its performance and proceeds to fulfil the contract on his part, is estopped from relying on the condition precedent. *Betts* v. *Perrin,* 14 *Wend. R.* 219.

IV. This is not an *executory,* but an *executed* contract. The property assigned and conveyed has been delivered over to the state, and a portion of it appropriated and disposed of by the state; the suit against the bank was discontinued, and the injunction dissolved, and the commissioners gave the bank a full release and discharge.

If, therefore, the condition is of any obligatory force, it is only as an *independent* covenant, and the defendants cannot, in any event, avail themselves of that covenant, in this suit, as a defence, except they allege and show the *insolvency* of the state, a thing which is legally impossible. *See Tippets* v. *Walker,* 4 *Mass. R.* 597.

V. The bill is not multifarious.

A complainant is not permitted to demand several distinct matters of distinct natures, against several defendants; nor can several complainants demand, by one bill, several matters perfectly distinct and unconnected, against one defendant, nor join separate demands against the same defendant. But, where one general right is claimed by the bill, though the defendants have separate and distinct rights, an objection for multifariousness cannot be maintained. *See Terrill* v. *Craig, Halst. Dig.* 168.

A bill which sets up only one sufficient ground for equitable relief, is not rendered multifarious by the insertion therein, of a separate and distinct claim, upon which the complainant is not entitled to ask for either discovery or relief. The complainant may join in the same bill, two good causes of complaint, arising out of the same transaction, where all the defendants are interested in the same claim of right, and where the relief asked for, as to each, is of the same nature. *Varick* v. *Smith*, 5 *Paige R.* 137.

The object of the bill in this case is to reach the assets of the Michigan State Bank, assigned to, and taken possession of, by the state. The bill states that Porter is president of the bank, and Joy & Porter are attorneys for the bank; that they received the assets in their hands from the state, for collection, and that they now claim to hold the same as attorneys for the bank. The bank is a proper and necessary party, for it claims the right to the assets. The bill prays for an account as against Joy & Porter, and for a receiver and account as against the bank, and for general relief; either or all of which the complainants are entitled to, if a sufficient case is made in the stating part of the bill. 1 *Hoff. Ch. Pr.* 49, *and notes* 1 *and* 2; *Ludlow* v. *Limon*, 2 *Caine's Ca.* 1, 39, 52, 53.

THE CHANCELLOR. By the act of 17th February, 1842, the legislature ratified the settlement made between the bank and the commissioners appointed by the state, except so much of it as purports to bind the state to pay certain debts of the bank, or debts for which the bank is liable, which the act repudiates.

In disposing of the demurrer, it will be necessary, therefore, to decide whether the commissioners were authorized by the act of February 1st, 1840, under which they acted, to bind the state to pay these debts? If not,

then, whether the legislature could confirm in part, and refuse to confirm in part, what the agents of the state had done, by ratifying what they were authorized to do, and rejecting what they were not authorized to do ; or was the state bound to ratify or reject the whole settlement?

I think it clear that the commissioners exceeded their powers in attempting to bind the state to pay these debts. They were authorized to commute, and receive an assignment of any of the assets of the bank, but not to contract for the payment of the debts of the bank, by the state. There is a manifest difference between taking an assignment of a piece of property subject to a lien, and an agreement on the part of the assignee to pay the debt; in the one case he would be personally liable for the payment of the debt, although the thing assigned might not be worth the half of it, while, in the other, he would at most but lose the property on which the debt was a lien. There is nothing in the act, express or implied, conferring this power on the commissioners. They might, with as great show of authority, have taken an assignment of all the assets of the bank, and have agreed the state should pay all its debts. In what do the cases differ ? Not in the power, but in the extent of its execution only.

The word " equitable," in the first section of the act, it has been insisted, would warrant a more liberal construction of the powers of the commissioners. I cannot think so. There is no connection, as I can discover, between it and the power given by the fourth section of the act. It is to be found only in the first section of the act, where it is used in connection with the powers mentioned in that section; which are, 1st, to settle with the bank; 2d, to give such time for the payment of the *balances* found to be due to the state, as the ability of the bank might seem to require, and to take security for their payment. It is in

connection with the first of these powers the word " *equitable*" is used. The words of the act are, " commissioners on the part of the state to settle with the Michigan State Bank, upon such terms as they may deem *equitable*." It has reference to the adjustment or settlement of the " balances" due from the bank to the state, and was intended to authorize the commissioners, in making up such balances, to allow all equitable claims or set-offs the bank might have against the state. This is what is meant by the word " equitable," in the first section of the act. If we look for its meaning into the previous legislation that had been had with a view to a settlement with the bank, we shall come to the same conclusion. The first act on the subject was the act of April 10, 1839. This act authorized the " committee" to settle with the bank for all deposites made with it by the state. The word equitable is not in it. The committee afterwards reported to the legislature they could not settle with the bank, because it insisted on having certain demands set off against what it was owing the state, which the committee did not feel authorized to allow, under the law appointing them. Thereupon, the joint resolution of the 19th April, 1839, extending the time for making the settlement, and increasing the powers of the commissioners, was passed. By this resolution the commissioners were authorized to settle with the bank " upon such terms as they might deem *equitable*." The same language is used in the act of February 1st, 1840, the first three sections of which, with some slight verbal alterations, in no way affecting the powers of the commissioners, are a transcript of the joint resolution of the 19th of April, preceding. Whether, therefore, we look to the act itself for the power of the commissioners, or to the course of legislation on the subject of

the settlement with the bank, the conclusion at which we arrive is the same.

" All written powers," says Mr. Lloyd, " such as letters of attorney, or letters of instruction, receive a strict interpretation ; the authority never being extended beyond that which is given in terms, or is absolutely necessary for carrying the authority so given into effect." *Paley on Agency, by Lloyd,* 192 ; *Atwood* v. *Munnings,* 7 *B. & C.* 278. *Story's Agency,* 66, *sec.* 68.

The next question is, whether the legislature had a right to reject the condition without declaring the whole settlement void. The commissioners accepted an assignment of property and debts, in full satisfaction of what was due to the state ; the bank was discharged from its debt to the state ; the property was delivered to the commissioners, and the injunction against the bank was dissolved. There was then a full and complete settlement of all matters between the state and bank. Had the commissioners stopped here, there can be no doubt both the bank and state would have been bound by the settlement. But they went further ; they annexed a condition to the settlement, that the state should pay certain debts of the bank, which they had no authority to do under the act appointing them. In this, and in this alone, they exceeded their powers. The state refuses to recognise this part of the settlement. The bank insists it cannot reject a part and confirm a part, but that it must reject or confirm the whole.

In *Story on Agency, (page* 156, *sec.* 166,*)* it is said the question may often arise, whether an act is wholly void or not, when the agent does more than he is authorized to do, or less than he is authorized to do. Lord Coke says, " Regularly, it is true, that where a man doth less than the commandment or authority committed to him, there, the commandment or authority being not pursued, the act

is void. And, where a man doth that which he is authorized to do, and more, there it is good for that which is warranted, and void for the rest. Yet both these rules have divers exceptions and limitations." *Co. Litt.* 158, *a.* "If a warrant of attorney is given to make livery to one person, and the attorney make livery to two, or if the attorney is to make livery of Blackacre, and the attorney makes livery of Blackacre and Whiteacre, the execution is good, so far as it is authorized by the power, and void as to the residue; *for the excess is clearly ascertainable.* So, if a letter of attorney be to make livery absolutely, and the attorney make upon condition, this is a good execution of the power, and amounts to a sufficient livery, and the condition is void." *Story on Agency,* 159, *sec.* 168. *Livermore on Agency,* 102. Again, "if an agent were authorized to procure insurance upon a ship for two thousand dollars, and he should procure a policy for two thousand dollars on the ship, and two thousand dollars on the cargo, the policy would be good as to the ship, and void as to the cargo, at least unless under special circumstances." *Story on Agency,* 160, *sec.* 169. *Livermore on Agency,* 101–102.

In *Nixon* v. *Hyseratt and Hyseratt,* 5 *J. R.* 58, an action was brought against the defendants on a covenant of seisin, in a deed executed by their attorney, who was authorized to sell the land and to "execute, seal, and deliver, in their names, such conveyances and assurances in the law, of the premises, unto the purchaser, his, her, or their heirs or assigns, for ever, as should or might be needful or necessary, according to the judgment of said attorney." The plaintiff was nonsuited. The Court says, "the attorney was authorized to sell and to execute conveyances, and assurances in the law, of the land sold, but no authority was given to bind his principal, by covenants. A con-

veyance or assurance is good and perfect without either warranty or personal covenants, and therefore they are not necessarily implied in an authority to convey; an authority is to be strictly pursued, and an act varying in substance from it, is void." Here the agent had done what he was authorized to do, and something more. He had not only sold the land and given a deed for it, but he had inserted a covenant of seisin in the deed, which he had no authority to do. The defendants had received the benefits of the sale, but it was not so much as pretended in that case, that they were, on that account, bound by the covenant of seisin; *that they could not hold on to the purchase money, and, at the same time, disclaim the covenant.*

So, in *Gibson* v. *Colt and others*, 7 *J. R.* 390. The defendants were the owners of a ship, and had authorized the master to sell her. The master sold her to the plaintiff, and, at the time of sale, represented her to be a registered vessel, according to the act of Congress. She was not a registered vessel, but a licensed coasting vessel only; and the action was brought for the deceit of the agent, in representing her to be a registered vessel. Judgment was given for the defendants, the Court holding that the agent had exceeded his authority in making the false representation, and that the defendants were not bound by it, although they had received ten thousand dollars for the ship.

In *Fenn* v. *Harrison and others*, 3 *T. R.* 757, defendants being the owners of a bill of exchange, which came to them by endorsement, employed an agent to get it discounted, telling him to carry it to market and get cash for it, but they would not endorse it. The agent procured a third person to endorse it, telling him he would indemnify him for it, and the bill was then discounted. The accep-

tor of the bill failed, and the plaintiff, who discounted it, applied to defendants for payment, who at first refused, but afterwards promised to take it up. The Court held the defendants were not bound by the promise made by their agent to the person who endorsed the bill, and that, therefore, there was no consideration for the promise made by them to the plaintiff, to take up the bill. The bill in this case had been discounted, and the defendants had received the money.

In *Snow* v. *Perry*, 9 *Pick. R.* 539, bank bills were handed to an agent, with directions to deliver them to Snow, and see their amount endorsed on a note which Snow held against Perry, or to take a receipt for the amount. Snow received the bills and gave a receipt, by which he promised to endorse the amount on the note, or return the bills when called for. The bank soon after failed. The Court held the taking of the bills was payment *pro tanto*, the agent having exceeded his authority in taking a *conditional* receipt. The Court say: "But the plaintiff relies upon the terms of the receipt, stated in the report, and the condition or alternative therein expressed. If this receipt had been given by *Perry himself*, or by an agent *competent to bind him* in this respect, he would be bound by the condition. Then the question recurs, could the messenger, consistently with his authority, accept such receipt? He was instructed to see the money endorsed, or to take a receipt as for so much money received in payment, or to bring the bills back. This was the extent of his authority."

The legal principle to be deduced from these cases, is this: That where an agent, acting within the scope of his authority, does a thing which, standing alone and by itself, would be binding on his principal, and, at the same time, does something more, which he was not authorized to do,

and the two are not so interwoven with each other that they cannot be separated, but constitute different parts of the same contract, that which the agent was authorized to do is binding on his principal, and that only which he was not authorized to do, is void.   As the covenant of seisin in *Nixon* v. *Hyseratt;* the false representation with regard to the registry of the vessel in *Gibson* v. *Colt;* the promise to indemnify the person who endorsed the bill in *Fenn* v. *Harrison,* and the condition in the receipt in *Snow* v. *Perry.*   In each of these cases the agent had done what he was authorized to do, and something more; but that something more stood by itself, and was "clearly *ascertainable,*" and was therefore void as it regarded the principal, and not merely voidable in connection with the whole contract.   The excess in each of these cases, was an excrescence upon the due execution of the power, deriving no nutriment from the power itself, and consequently not entering into and forming a part of its execution, which was complete without it.   By this I do not intend to be understood as saying, that the land or the ship would have sold for as much as it did, without the covenant of seisin, or false representation; or that the note would have been discounted had it not been endorsed, or that the bank bills would have been received, had an unconditional receipt been required.   This is not the principle on which these cases were decided; but the total want of authority in the agent to do what he did.

In what respect does the present case differ from *Nixon* v. *Hyseratt?*   They are, it seems to me, the same in principle.   They differ in form only.   In that case there was a covenant; in this, there is a condition subsequent, not a condition precedent; and in both cases the agent exceeded his authority.   On what principle of law can it be holden, that the covenant in that case was void and not binding

on the principal, and the condition in the present case is good and binding on the state?

A person who deals with an agent is bound to inquire into his authority, and ignorance of the extent of the agent's authority is no excuse. But it cannot be said the bank was ignorant of the authority of the commissioners, who acted under a public law or statute of the state, of which the bank had full knowledge. The commissioners, and those acting on the part of the bank, I have no doubt, supposed they had authority. But this, while it acquits the commissioners and the representatives of the bank of bad faith, can have no effect on the legal rights of the parties to the settlement. Every man is supposed to know what the law is, and his rights are to be determined accordingly. It is no excuse that he was ignorant of the law, or had given an erroneous construction to it. If the bank suffer in consequence of such ignorance, it is not the fault of the state.

In *Nixon* v. *Hyseratt*, it does not appear Nixon knew the agent was exceeding his authority, in warranting that his principals were seized of the land. The bank is chargeable with such knowledge, or, in other words, with a knowledge that the commissioners were exceeding their powers, in consenting to the condition; and can it take advantage of its own wrong, to compel the state either to ratify the condition, or reject the settlement *in toto?* Would not the adoption of such a rule open a door to fraud?—to collusion between the agent and persons dealing with him?

The agreement was not executory but executed at the time; and the bank has, from that time to the present, had all the advantages and benefits of the settlement. The injunction was dissolved and the debt due to the state cancelled. If it was now in the power of the state to reject the settlement, which it cannot do, (except the

condition which was never binding on the state,) the bank could not place back the claim of the state where it was before the settlement, and the dissolution of the injunction. And must the state either lose all benefit of the proceedings it had instituted against the bank, and of the injunction it had obtained, or pay a sum of money for the bank it never had agreed to pay? The doctrine contended for, if law, would present this alternative.

It is insisted the bill is multifarious, and the prayer of the bill is referred to in proof of the fact. To determine whether a bill is multifarious, we must look to the stating part of the bill, and not to the prayer alone; for if, in his prayer for relief, complainant ask several things, to some of which he may be entitled and to others not, the bill is not, on that account, multifarious, but he will, on the hearing, be entitled to that specific relief, only, which is consistent with the case made in the stating part of the bill. The whole drift and object of the bill is to obtain a discovery and account, from Joy & Porter, of the assets assigned, and in their possession as attorneys for the bank when the assignment was made, and which they afterwards continued to hold as attorneys for the state. The bank is made a party in consequence of the claim it sets up to these assets. The bill is somewhat in the nature of a bill of interpleader; but, instead of being filed by Joy & Porter, it is filed by the commissioners against them and the bank, they setting up the claim of the bank as an excuse for not accounting to the commissioners.

Demurrer overruled, with costs.